Filed 2/18/14  P.v. Torres CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069510 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F05656) |
| v. | |
| JAIME TORRES et al., | |
| Defendants and Appellants. | |

Defendants Jaime Torres, Sergio Torres, and Jose Gonzalez were charged (along with several others) with murdering Jose Guerrero on Memorial Day in 2008.[1]  Sergio pled no contest to the lesser included offense of voluntary manslaughter in exchange for a middle term sentence of six years in prison.  A jury found Jaime and Jose guilty of first

---

[1]    Because many of the people involved in this case have the same surnames, to avoid confusion we will often refer to people by their first names.  We will refer to defendant Jose Gonzalez as Jose and to the victim, Jose Guerrero, as Guerrero.

1

degree murder and found true two sentence enhancement allegations (gang and firearm), and the trial court sentenced them each to 50 years to life in prison.

On appeal, Sergio challenges the portion of the court's award of victim restitution payable to Guerrero's widow.

For his part, Jaime contends there was insufficient evidence to convict him based on the natural and probable consequences doctrine because the murder was not a reasonably foreseeable consequence of the fight Jaime started. He also argues that the jury instructions were erroneous because they did not allow the jury to consider whether he might have been guilty of only second degree murder under the natural and probable consequence doctrine, even if the shooter was guilty of first degree murder. Jaime also contends his trial attorney was ineffective in: (1) failing to object to an instruction that a perpetrator and an aider and abettor are "equally guilty" of the crime; and (2) failing to object to part of the victim restitution that Sergio (and another defendant) had already successfully opposed.

Jose contends there was insufficient evidence to convict him as an aider and abettor because "gang membership, plus presence" is not sufficient to establish aiding and abetting liability. He also contends the trial court should have raised sua sponte the issue of his trial counsel's ineffectiveness in failing to secure the testimony of a particular witness, or else this court should find on appeal that his counsel was ineffective.

As detailed further below, Jaime and Jose each also join in various arguments made by the other, and Jaime purports to join in Sergio's restitution argument.

We agree with Jaime that the jury instructions were erroneous because they did not allow the jury to consider whether the defendants might have been guilty of only second degree murder under the natural and probable consequence doctrine, even if the shooter committed first degree murder. Consistent with our prior decisions on this issue, we will reverse Jaime's and Jose's convictions and remand for retrial unless the People accept reduction of the convictions to second degree murder. We also conclude (and the

2

People concede) that there was insufficient evidence to support the award of victim restitution to Guerrero's widow, and we remand for new restitution hearings as to all three defendants.

FACTUAL AND PROCEDURAL BACKGROUND

For our purposes, the evidence need not be recited in detail. Suffice it to say that in May 2008 Guerrero and his family, which included his wife, Celica, and two stepsons who were Sureño gang members, were living at a house on Lindley Drive. They had lived there for seven years.

On Memorial Day, Guerrero was with some other family members in the garage and driveway area of his house when a group of young men walked up, including one wearing a red bandana across his face. That was Jaime, who is a Norteño gang member. Also in the group was Jose, who is also a Norteño gang member.

Jaime challenged Guerrero's stepsons to come out and fight. Guerrero said he was going to call the police and pulled out his cell phone. A physical struggle between Jaime and Guerrero ensued. At some point, Jaime pulled out a gun. According to Guerrero's stepdaughter, Veronica, Guerrero was able to grab the gun and throw it away, but he threw it in the direction of the group that Jaime came with. Another witness testified that Guerrero "somehow hit the gun . . . out of [Jaime's] hand, and it flew towards where the group was." Guerrero's widow testified that it was Jaime who "threw [the gun] to where the others were at."

Another member of the group of young men picked up the gun and told Guerrero to let go of Jaime. When he did not do so, the man fired a shot, hitting a nearby van. The man then stepped closer and shot Guerrero in the head.

The People charged seven individuals, including Jaime, Jose, and Sergio, with Guerrero's murder. In May 2011, Sergio pled no contest to the lesser included offense of voluntary manslaughter in exchange for a middle-term sentence of six years in prison. In late August 2011, Jaime and Jose (along with another defendant who was ultimately

3

acquitted) went to trial. At trial, Jose testified that he followed the group of young men down Lindley toward Guerrero's house but claimed he never got closer than "one house over."

The prosecutor argued there was "high confidence that the gunman, the actual killer was [Jose]" and that the shooter committed first degree murder. The prosecutor further argued that to the extent they did not pull the trigger, the defendants were guilty of the murder either because they aided and abetted the murder or because they committed or aided and abetted the crime of fighting or challenging to fight and the murder was a natural and probable consequence of that crime.

The jury found both Jaime and Jose guilty of first degree murder and found true two sentence enhancement allegations (gang and firearm). Jose moved to set aside the verdict against him and for a judgment of dismissal on the ground that the prosecutor interfered with his ability to call a witness, Shawn Siona, who would have corroborated Jose's testimony. The trial court denied that motion.

The court ordered Sergio to pay Guerrero's widow $4,500 in victim restitution. The court later ordered Jaime and Jose to each pay $11,500 in victim restitution to Guerrero's widow.

Sergio, Jaime, and Jose each filed timely notices of appeal.

## DISCUSSION

### I

### *Sufficiency Of The Evidence*

### A

### *Liability As An Aider And Abettor*

Jose contends the evidence was insufficient to support his conviction of murder on the theory that he aided and abetted either the crime of fighting or challenging to fight or the crime of murder because "gang membership, plus presence" is not sufficient to establish aiding and abetting liability. This argument lacks merit, however, because Jose

4

himself admits that under the jury instructions in this case, the prosecution offered *three* different theories of his guilt: "The first theory was that Jose personally shot Mr. Guerrero . . . . The second theory was that Jose had been a direct aider and abettor of premeditated murder . . . . The third theory . . . was that Jose had aided and abetted violation of Penal Code section 415 (fighting or challenging to fight) and that premeditated murder had been a natural and probable consequence of that offense."

Jose's challenge to the sufficiency of the evidence addresses only *two* of the three theories of liability for the murder offered against him, i.e., that he was guilty as an aider and abettor for aiding and abetting either the crime of murder or the crime of fighting or challenging to fight (of which the murder was a natural and probable consequence). Jose does *not* challenge the sufficiency of the evidence to support his conviction on the third theory -- that he was the shooter. Under these circumstances, reversal is not required absent an affirmative indication in the record that the verdict actually rested on a theory that was not supported by substantial evidence. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Because Jose points to nothing in the record to show that the jury's verdict rested on the theory that he acted as an aider and abettor -- as opposed to the theory that he was the shooter -- his challenge to the sufficiency of the evidence is without merit.

To the extent Jose frames this argument as a challenge to the jury instructions on aiding and abetting -- on the theory that it is error to give instructions that, while correct under the law, find no support in the evidence -- that recharacterization is to no avail. In *Guiton*, the Supreme Court explained that "instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. [Accordingly,] the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton*, *supra*, 4 Cal.4th

5

at p. 1130.) As we have noted, Jose has failed to point to anything in the record that shows the verdict against him was based on the conclusion that he acted as an aider and abettor as opposed to acting as the perpetrator. Under these circumstances, even if it was error to instruct the jury on the aiding and abetting theory with respect to Jose, no prejudice has been shown.

To the extent Jaime purports to join Jose in this recharacterized misinstruction argument, we have no occasion to reach any other result, as by his bare joinder Jaime fails to explain how the alleged misinstruction on aiding and abetting principles prejudiced him. Indeed, we cannot see how legally correct instructions on aiding and abetting liability could have prejudiced Jaime. There was evidence that Jaime perpetrated the crime of fighting or challenging to fight, and as a consequence Guerrero was killed. Jaime cannot argue (as Jose does) that he was merely *present* during the fight. Under these circumstances, Jaime has failed to show any possible basis for finding prejudice to him from legally correct aiding and abetting instructions.

B

*The Murder As A Reasonably Foreseeable Consequence Of The Street Fight*

Joined by Jose, Jaime contends the evidence was insufficient to support his conviction of murder based on the natural and probable consequences doctrine because of the "unusual and unexpected intervening circumstance . . . that Guerrero himself took [the] firearm [Jaime] had been using only as a bludgeon, and threw it toward a crowd of Norte[ñ]os, one of whom picked up that gun and murdered Guerrero." We disagree.

Jaime acknowledges that he could be held liable for Guerrero's murder as long as it was a "natural and probable" consequence of the fight he instigated with Guerrero. Under California law, " '[a] "natural" consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.' " (*People v. Leon* (2008) 161 Cal.App.4th 149, 158.) Jaime contends that Guerrero's act of "grab[bing the] gun" from Jaime and "toss[ing] it toward th[e] shooter"

6

was not foreseeable and thus constituted "an unusual and unexpected intervening circumstance" that precluded his conviction for murder.

We first note that the factual predicate Jaime offers in support of his argument is inconsistent with the applicable standard of review. Jaime asserts that "Guerrero was able to grab the gun and throw it away, but he threw it in the direction of the group" that Jaime came with. In support of this factual assertion, Jaime cites the testimony of Guerrero's stepdaughter, Veronica. As we have noted, however, another witness testified that Guerrero "somehow hit the gun . . . out of [Jaime's] hand, and it flew toward where the group was." When asked if it looked like Guerrero "just knocked the gun away or actually was able to grab the gun away and then throw it," the witness confirmed that Guerrero "[k]nock[ed the gun] out of [Jaime's] hand." And Guerrero's widow testified that it was *Jaime* who "threw [the gun] to where the others were at."

Jaime admits that the substantial evidence standard of review applies to this argument and that under that standard of review we "must review the whole record in the light most favorable to the judgment below." (*People v. Johnson* (1980) 26 Cal.3d 557, 562.) In making his argument, however, he defies the standard of review and chooses the testimony that best suits his purposes, not the testimony that is most favorable to the judgment and, in particular, to the conclusion that the murder was the natural and probable consequence of the fight Jaime started.

As our Supreme Court noted in *People v. Medina* (2009) 46 Cal.4th 913, under the natural and probable consequences doctrine "[t]he precise consequence need not have been foreseen." (*Id.* at p. 927.) Instead, " ' " 'it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' " ' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871.) "To break the chain of causation, the

7

intervening act must be an " ' " 'unforeseeable . . . extraordinary and abnormal occurrence.' " ' "[2]  (*People v. Fiu* (2008) 165 Cal.App.4th 360, 371-372.)

On the evidence here, there was nothing extraordinary or abnormal about either: (1) Guerrero knocking the gun out of Jaime's hand, with it ending up near Jaime's companions; or (2) Jaime himself throwing the gun toward his companions.  Neither of these scenarios constituted "an unusual and unexpected intervening circumstance."  Thus, there was substantial evidence for the jury to reasonably find that Jaime was liable for the first degree murder of Guerrero under the natural and probable consequences doctrine.

As for Jose's joinder in this argument, we again note that the prosecution proceeded against Jose on multiple theories of liability for Guerrero's murder.  Even if we were to find that, as to Jose, there was insufficient evidence to find that first degree murder was a natural and probable consequence of the fight he aided and abetted (because, for example, there was no evidence Jose was aware Jaime had a gun before Jaime brought it out during the fight), we could reverse Jose's conviction only upon a showing to a reasonable probability, based on the record, that the jury found him guilty on this theory, as opposed to the theory that he was the actual shooter.  (See *People v. Guiton*, *supra*, 4 Cal.4th at pp. 1129-1130.)  Jose has not made any such showing. Accordingly, this claim of evidentiary insufficiency is of no avail to Jose either.

---

[2]     The foregoing principles are general principles of proximate causation.  That these principles govern in determining what constitutes a natural and probable consequence for purposes of the natural and probable consequences doctrine is evidenced by the Supreme Court's cite to *People v. Schmies* (1996) 44 Cal.App.4th 38, 50 in *Medina*.  (See *People v. Medina*, *supra*, 46 Cal.4th at p. 927.)  In the parenthetical attached to its cite to *Schmies*, the Supreme Court specifically noted that *Schmies* was relevant because of its discussion of "proximate cause principles."  (*Medina*, at p. 927.)

II

*Jury Instructions*

A

*Foreseeability Of Deliberate And Premeditated Murder*

Joined by Jose, Jaime contends the trial court erred when it failed to instruct the jury that under the natural and probable consequences doctrine an aider and abettor may be culpable of a lesser offense than the perpetrator.  More specifically, Jaime contends the jury instructions given here "made it appear that if the perpetrator shot Guerrero with deliberation and premeditation, then [Jaime]  necessarily was guilty of first-degree murder as well," which Jaime contends is contrary to this court's decision in *People v. Woods* (1992) 8 Cal.App.4th 1570.[3]  We agree.

Like this case, *Woods* involved a murder charge based on aiding and abetting liability and the natural and probable consequences doctrine.  (See *People v. Woods*, *supra*, 8 Cal.App.4th at p. 1579.)  When the jury asked the trial court whether a defendant could be found guilty of aiding and abetting second degree murder if the perpetrator of the murder was guilty of first degree murder, the trial court answered, "No."  (*Ibid.*)

On review, in a majority opinion written by Justice Scotland, with Justice Raye concurring and Justice Sparks dissenting, this court agreed with the defendant that the trial court had misinstructed the jury.  (*People v. Woods*, *supra*, 8 Cal.App.4th at p. 1580.)  The court first discussed the statutory basis for aiding and abetting liability: Penal Code section 31, which declares that " '[a]ll persons concerned in the commission of a crime,' " including an aider and abettor, " 'are principals in any crime so committed.' " (*Woods*, at pp. 1581-1583.)  The court then discussed the natural and probable consequences doctrine, concluding that "in specifying an aider and abettor is

---

[3]    The continuing validity of *Woods* is currently before our Supreme Court.  (See *People v. Chiu* (Apr. 23, 2012) [nonpub. opn.], review granted Aug. 15, 2012, S202724.)

liable for 'any crime so committed' by the perpetrator, the Legislature intended--consistent with common law--that the aider and abettor is guilty not only of the criminal act originally contemplated and abetted but also of any other crime by the perpetrator which is a reasonably foreseeable consequence of the offense originally contemplated by the aider and abettor." (*Id.* at p. 1584.) The court then explained that "where 'any crime so committed' by the perpetrator is determined to be first degree murder, it is murder in the first degree for which section 31 assigns responsibility to an aider and abettor *provided said crime is a reasonably foreseeable consequence of the criminal act originally contemplated by the perpetrator and the aider and abettor*." (*Ibid.*) According to the court, "the continuing viability of the common law rule of aider and abettor liability for reasonably foreseeable consequences of the criminal act originally contemplated compels the conclusion that, in enacting section 31, the Legislature intended that an aider and abettor may be found guilty of a lesser crime or lesser degree of crime than the ultimate offense the perpetrator is found to have committed." (*Woods*, at pp. 1585-1586.) The court continued as follows: "While the perpetrator is liable for *all* of his or her criminal acts, the aider and abettor is liable vicariously only for those crimes committed by the perpetrator which were reasonably foreseeable under the circumstances. Accordingly, an aider and abettor may be found guilty of crimes committed by the perpetrator which are less serious than the gravest offense the perpetrator commits, i.e., *the aider and abettor and the perpetrator may have differing degrees of guilt based on the same conduct depending on which of the perpetrator's criminal acts were reasonably foreseeable under the circumstances and which were not*." (*Id.* at pp. 1586-1587.) The court explained that "[a]lthough necessarily included offenses need not be charged, the perpetrator nevertheless committed them as he or she committed the greater criminal offense," and "[t]he fact the perpetrator cannot be found guilty of both a greater and a necessarily included offense [citations] should not preclude an aider and abettor from being found guilty of an uncharged, necessarily included

10

offense when the lesser, but not the greater, offense is a reasonably foreseeable consequence of the crime originally aided and abetted." (*Id.* at pp. 1587-1588.) The court concluded, "Therefore, in determining aider and abettor liability for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence. Otherwise, . . . the jury would be given an unwarranted, all-or-nothing choice for aider and abettor liability." (*Id.* at p. 1588.)

In *People v. Hart* (2009) 176 Cal.App.4th 662, this court applied the reasoning of *Woods* to a case that involved a charge of attempted murder. Recently, however, in *People v. Favor* (2012) 54 Cal.4th 868, the Supreme Court disapproved *Hart*. (*Favor*, at p. 879, fn. 3.) In *Favor*, the Supreme Court noted that, "contrary to *Hart*'s presupposition, attempted premeditated murder and attempted unpremeditated murder are not separate offenses" because "[a]ttempted murder is not divided into different degrees." (*Favor*, at p. 876.) According to the court, "[b]ecause *Woods* involved murder--not attempted murder--where there are different degrees of the offense, *Hart*'s reliance on *Woods*'s lesser included offense analysis [wa]s misplaced." (*Favor*, at p. 877.)

As the court explained in *Favor*, deliberation and premeditation are relevant to the crime of attempted murder because of subdivision (a) of Penal Code section 664, which increases the punishment for attempted murder when the trier of fact finds that the attempted murder was willful, deliberate, and premeditated. (*People v. Favor*, *supra*, 54 Cal.4th at p. 877.) In *People v. Lee* (2003) 31 Cal.4th 613, the Supreme Court had held that under section 664 "premeditation is not a required component of [an] aider and abettor's mental state." (*Favor*, at p. 877.) In *Favor*, the court relied on *Lee* for the principle that "an aider and abettor need not share the heightened mental state of the direct perpetrator for the applicability of section 664(a)'s penalty provision. [Citation.] Once the jury finds that the murder attempted was deliberate and premeditated, both the

11

direct perpetrator and the aider and abettor are subject to section 664(a)'s penalty provision." (*Favor*, at p. 879.)

The People contend that even though "*Favor* did not . . . address the analysis in *Woods*" other than to point out that *Woods* involved the crime of murder, which, unlike attempted murder, involves different degrees, defendants' argument in this case based on *Woods* nonetheless "fails under the Supreme Court's reasoning in *Favor*." But thereafter, the People fail to point to any reasoning from *Favor* that supports their argument. Instead, the People assert generally that under the natural and probable consequences doctrine, an aider and abettor of a target offense can be held liable for " '*any reasonably foreseeable offense* committed as a consequence by the perpetrator.' " The People then contend that "in examining whether a charged offense was reasonably foreseeable, the Supreme Court has not analyzed the foreseeability of the charged offense element-by-element." In support of this proposition, the People cite *People v. Medina*, *supra*, 46 Cal.4th at pages 920-927. In *Medina*, however, the Supreme Court did not confront the question we confront today. The issue in *Medina* was one of substantial evidence, namely, was there sufficient evidence to support the jury's finding that "the nontarget offenses of murder and attempted murder were a natural and probable consequence of the target offense of simple assault which [the defendants] had aided and abetted"? (*Id.* at p. 916.) At no point in *Medina* did the Supreme Court address the distinction between first degree murder and second degree murder, let alone hold or even suggest that an aider and abettor may not be found guilty of the latter crime under the natural and probable consequences doctrine when the perpetrator was guilty of the former. "[A]n opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

Under our Supreme Court's articulation of the natural and probable consequences doctrine, an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of *any reasonably foreseeable offense* committed by the person he

12

aids and abets." (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5, italics added.) The People acknowledge as much. "Second degree murder is a lesser included offense of first degree murder." (*People v. Blair* (2005) 36 Cal.4th 686, 745.) It follows that if the offense of second degree murder was reasonably foreseeable, but the greater offense of first degree murder was not, then under the natural and probable consequences doctrine an aider and abettor could be found liable for the former offense but not for the latter. Nothing in *Medina* or *Favor* undercuts this reasoning.

With that in mind, we turn to the particular jury instructions given here. This is *not* a case, like *Woods*, where the trial court expressly told the jurors they *could not find* the defendants guilty of aiding and abetting second degree murder if the perpetrator of the murder was guilty of first degree murder. Nevertheless, as we will explain, the jury instructions here were misleading because they implied that the degree of murder of which defendants were guilty as aiders and abettors depended solely on the degree of murder of which the perpetrator was guilty.

As relevant to the present issue, the jury instructions began by explaining that a person may be guilty of a crime either because he was the perpetrator who directly committed it or because he aided and abetted the perpetrator. The court then explained the elements of aiding and abetting. The court then instructed the jury as follows:

"Before you may decide whether defendant Juan Carlos Gonzalez, Jose Gonzalez and or Jaime Torres is guilty of murder as an aider or abettor, you must first decide whether any of them [is] guilty either directly or as an aider and abettor to fighting or challenging to fight in violation of Penal Code Section 415.

"To prove the defendant is guilty of murder as an aider and abettor, the People must prove that:

"One, the defendant is guilty either directly or as an aider and abettor of fighting or challenging to fight;

13

"Two, during the commission of fighting or challenging to fight, a co-participant in that crime committed the crime of murder;

"And three, A, under all of the circumstances, a reasonable person in defendant's position would have known that the commission of murder in the first degree was a natural and probable consequence of the commission of the fighting or challenging to fight;

"Or, three, B, under all of the circumstances, a reasonable person in defendant's position would have known that the commission of murder in the second degree was a natural and probable consequence of the commission of fighting or challenging to fight.

"A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include the victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . .

"[¶] . . . [¶]

"To decide whether the crimes of murder and/or fighting or challenging to fight were committed, please refer to separate instructions that I will give you on those crimes."

Thereafter, in instructing the jury on murder, the court gave the following instructions:

"Homicide is the killing of one human being by another.  Murder is a type of homicide.  And the defendants are charged with murder.

"The defendants are charged in Count One with murder in violation of Penal Code Section 187.  To prove that the defendant is guilty of the crime as an aider and abettor, the People must prove that:

"One, the perpetrator committed an act that caused the death of another person;

"And, two, when the perpetrator acted, he had a state of mind called malice aforethought.  [¶]  There are two types of malice aforethought, express malice and

14

implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

"The perpetrator acted with express malice if he unlawfully intended to kill.

"The perpetrator acted with implied malice if:

"One, he intentionally committed an act;

"Two, the natural consequences of that act were dangerous to human life;

"Three, at the time he acted, he knew his act was dangerous to human life;

"And, four, he deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular time.

"If you decide the defendant has committed murder as an aider and abettor, you must decide whether it's murder of the first or second degree.

"A perpetrator is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.

"The perpetrator acted willfully if he intended to kill.

"The perpetrator acted deliberately if he carefully weighed and considered for and against his choice and, knowing the consequences, decided to kill.

"The perpetrator acted with premeditation if he decided to kill before completing the act that caused the death.

"The length of time a person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.

"A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be

15

reached very quickly. The test is the extent of the reflection, not the length of time. All other murders are murder of the second degree.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met the burden, you must find the defendant not guilty of first degree murder.

"Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the perpetrator committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

Under the foregoing instructions, the jury was told that to find a defendant guilty of murder as an aider and abettor, the People had to prove (among other things) that a reasonable person in the defendant's position would have known that the commission of murder in the first degree *or* murder in the second degree was a natural and probable consequence of the commission of the fighting or challenging to fight. Later on, the instructions told the jurors that if they decided a defendant committed murder as an aider and abettor, they "must decide whether it's murder of the first or second degree." Immediately thereafter, however, the instructions referred only to the *perpetrator*, as follows:

"A perpetrator is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.

"The perpetrator acted willfully if he intended to kill.

"The perpetrator acted deliberately if he carefully weighed and considered for and against his choice and, knowing the consequences, decided to kill.

"The perpetrator acted with premeditation if he decided to kill before completing the act that caused the death.

"[¶] . . . [¶]

16

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met the burden, you must find the defendant not guilty of first degree murder."

As Jaime argues, the foregoing instructions erroneously "made it appear that if the perpetrator shot Guerrero with deliberation and premeditation, then [Jaime] necessarily was guilty of first-degree murder as well." The same is true as to Jose, if the jury did not find him to be the shooter. Furthermore, this error was *not* corrected by the earlier instruction that informed the jury that defendants were guilty of murder as aiders and abettors if (among other things) a reasonable person in their position would have known that the commission of murder in the first degree *or* murder in the second degree was a natural and probable consequence of the commission of the fighting or challenging to fight. Under the instructions taken as a whole, even if the jury found that a reasonable person in defendant's position would have known only that the commission of murder in the *second* degree was a natural and probable consequence of the commission of the fighting or challenging to fight, the jury still could have concluded that the defendant was guilty of *murder* as an aider and abettor if the other elements of that theory were met. In then moving on to decide "whether it's murder of the first or second degree," the jurors could have understood the instructions to tell them to focus on whether *the perpetrator* acted willfully, deliberately, and with premeditation, and if he did so, then the murder *of which defendants were guilty* was murder in the first degree, *even though* the jury had earlier determined that a reasonable person in defendants' position would have known only that the commission of murder in the second degree was a natural and probable consequence of the commission of the fighting or challenging to fight.

Correct instructions would have told the jurors that if they found the perpetrator committed first degree murder, they still needed to determine the offense of which defendants were guilty (if any) by determining (among other things) what offense -- first degree murder or second degree murder -- a reasonable person in defendants' position

17

would have known was a natural and probable consequence of the commission of the fighting or challenging to fight. The instructions here did not clearly instruct the jury to do that but instead suggested that the degree of murder of which defendants were guilty as aiders and abettors depended solely on the degree of murder of which the perpetrator was guilty. That was error.

"Error in instructing the jury concerning lesser forms of culpability is reversible unless it can be shown that the jury properly resolved the question under the instructions, as given." (*People v. Hart*, *supra*, 176 Cal.App.4th at p. 673.)[4] No such showing has been made here. Furthermore, this conclusion applies to Jose as well as to Jaime, even though Jose was subject to the additional theory that he was the perpetrator, because the record does not show whether the jury found Jose guilty as the perpetrator, as an aider and abettor of the murder, or as an aider and abettor of fighting or challenging to fight based on the natural and probable consequences doctrine. Nevertheless, because "the court's instructional error affected only the degree of the crime of which [defendant] was convicted," we " 'may reduce the conviction to [the] lesser degree [of the offense] and affirm the judgment as modified, thereby obviating the necessity for a retrial,' " but at the same time we must " 'give the prosecutor the option of retrying the greater offense, or accepting [the] reduction to the lesser offense.' " (*People v. Woods*, *supra*, 8 Cal.App.4th at p. 1596.) Accordingly, that is what we will do.

B

*CALCRIM No. 400 And Its "Equally Guilty" Language*

Joined by Jose, Jaime contends he received ineffective assistance of counsel because his trial attorney did not object when the trial court instructed the jury that a perpetrator and an aider and abettor are "equally guilty" of the crime. This instruction is

---

[4] The Supreme Court's disapproval of *Hart* in *Favor* did not extend to this principle of law. (See *People v. Favor*, *supra*, 54 Cal.4th at p. 879, fn. 3.)

18

from CALCRIM No. 400, which, as given here, provided in part that "[a] person is equally guilty of a crime whether he committed it personally or aided and abetted the perpetrator who did commit it."

We have explained the applicable law as follows:

"Generally, a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime. (§ 31; see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122–123.)

"However, in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1114-1122 . . . [an aider might be found guilty of first degree murder, even if shooter is found guilty of manslaughter on unreasonable self-defense theory]; *People v. Woods* [*supra*] 8 Cal.App.4th [at pp.] 1577-1578 . . . [aider might be guilty of lesser crime than perpetrator, where ultimate crime was not reasonably foreseeable consequence of act aided, but a lesser crime committed by perpetrator during the ultimate crime was a reasonably foreseeable consequence of the act aided].)

"Because the instruction as given was generally accurate, but potentially incomplete in certain cases, it was incumbent on [the defendant] to request a modification if []he thought it was misleading on the facts of this case. H[is] failure to do so forfeits the claim of error. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 . . . [party may not claim 'an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language']; see *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163-1165 . . . (*Samaniego*) [challenge to CALCRIM No. 400 forfeited for failure to seek modification]; but see *People v. Nero* (2010) 181 Cal.App.4th 504, 517-518 . . . (*Nero*) [construing CALJIC No. 3.00, also using the 'equally guilty' language, and finding it misleading 'even in unexceptional circumstances'].)" (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119, fn. omitted.)

19

Because there was no objection to the "equally guilty" language here, on appeal Jaime claims his counsel was prejudicially deficient in failing to object. Jose contends the instruction is also reviewable under Penal Code section 1259 because his substantial rights were affected by it. Regardless of the basis for challenging the instruction, the premise of the challenge is that the instruction (and defense counsel's failure to object to it) was prejudicial because the jury was constrained to find defendants guilty as aiders and abettors of the same degree of murder as the perpetrator. For the reasons previously stated, however, we are already reversing defendants' first degree murder convictions for either a reduction to second degree murder or retrial. Because a conclusion in their favor on the present argument would not entitle defendants to any greater relief, this argument is moot, and we need not consider whether counsel was ineffective for failing to object to the "equally guilty" instruction or whether the instruction affected defendants' substantial rights.

III

*Ineffective Assistance Of Counsel*

Jose contends that based on the information he put before the trial court in his postverdict motion to dismiss for prosecutorial misconduct, the trial court should have recognized that by failing to secure the testimony of Shawn Siona at trial, Jose's trial counsel "had been deficient," and the trial court should have "raise[d] the issue of ineffective assistance *sua sponte*." Alternatively, he contends on appeal that his trial counsel was ineffective for failing to secure Siona's testimony. According to Jose, he is entitled to either a new trial based on ineffective assistance of counsel or remand with "an opportunity to request substitute counsel to assist in a new trial motion based on ineffective assistance of counsel." We disagree.

The basic facts are these: In February 2009, a private investigator hired by Jose's trial counsel obtained a statement from Shawn Siona, a witness to the shooting, that was favorable to Jose. When it became apparent in early 2011 that trial would commence

20

sometime in the summer, the investigator began trying to locate Siona again to serve him with a subpoena. Efforts to locate him continued through the trial in late August and early September. On Wednesday, September 6, Jose's trial counsel advised the prosecutor that he intended to call Siona as a witness but Siona had not yet been located. On September 7, the investigator told Jose's attorney that she had a meeting scheduled with Siona for Friday, September 9. The attorney instructed the investigator to go forward with the meeting and serve Siona with a subpoena to testify on Monday, September 12. Jose's trial counsel advised the prosecutor that Siona had been located and that a meeting was scheduled with him. At that time, Jose's attorney provided the prosecutor with a copy of Siona's statement for the first time.

On the evening of September 8, Siona rescheduled the meeting to September 10. On September 9, a detective located and met with Siona, who confirmed his earlier statement. Siona failed to appear for his meeting with the investigator on September 10. The investigator tried to locate him but could not. With no contact from Siona by late Sunday, Jose's trial counsel decided to focus on finalizing his closing argument. On Monday, Jose's attorney advised that Siona would not be testifying, and with no further witnesses, the case proceeded to closing arguments.

With these facts in mind, we first address Jose's claim that he has shown on appeal that his trial counsel was ineffective for failing to secure Siona's testimony at trial. To prevail on his claim of ineffective assistance of counsel, Jose must show that his trial attorney's assistance was objectively unreasonable under prevailing professional norms. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) In determining whether counsel's performance was deficient, we must exercise "deferential scrutiny" (*Ledesma*, at p. 216) and refrain from engaging in "the perilous process of second-guessing" counsel's rational tactical decisions (*People v. Miller* (1972) 7 Cal.3d 562, 573). Where the record does not contain

21

an explanation for the challenged aspect of representation, the judgment must be affirmed on appeal unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 425-426, overruled on another ground as stated in *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372.) In such a case, we may reverse " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

According to Jose, his trial counsel's "decision not to produce [Siona] as a witness did not reflect a tactical decision but a series of blunders, and there could have been no reasonable basis for not wanting the jury . . . to hear what [Siona] had to say in support of Jose's defense." Viewed with appropriate deference, however, we believe that Jose has not shown that the actions of his trial counsel were objectively unreasonable.

Jose first complains of his attorney's failure to put Siona under subpoena, even though the investigator hired by his attorney obtained a favorable statement from Siona more than two years before trial. In the trial court, however, Jose's attorney attested that he did not instruct the investigator to serve Siona with a subpoena at the outset of the case because they "were early on in th[e] case" and "because of what appeared to be his willingness to cooperate with the defense at that point." Specifically, "Siona advised that he would be cooperative and would testify when and if the necessity for it arose." Jose's attorney further attested that "[o]nce it became clear that [they] were near the beginning of this trial, [he] contacted [the] investigator and had her begin the process of locating witnesses and getting them subpoenaed for this trial." "This effort included attempts to locate and serve . . . Siona." Unfortunately, at this time they were unable to locate him. The efforts to locate Siona "continued in earnest" through the time of trial -- indeed, through Jose's defense case. Although the investigator was eventually able to set up a meeting with Siona, Siona rescheduled that meeting and then failed to show. At that

22

point, time essentially ran out to secure Siona's testimony. We do not perceive, in these circumstances, that the conduct by Jose's trial counsel was objectively unreasonable.

To the extent Jose complains that "the police found [Siona] at home one day after looking," that fact does not demonstrate deficient performance by Jose's attorney. The evidence showed that after the district attorney told a police detective on Thursday, September 8, 2011, that the defense intended to call Siona to testify on Monday, September 12, the detective was able to locate Siona on Friday, September 9, at the address on Lindley that Siona had given Jose's investigator back in 2009. At that time, however, Siona had already voluntarily agreed to meet with the defense investigator -- first on Friday, September 9, and then on Saturday, September 10. Given this agreement, and Siona's previously expressed intent to cooperate with the defense, Jose shows no reason why his attorney reasonably should have anticipated that Siona would not show up for the scheduled meeting and should have directed the investigator to look for Siona at his residence instead.

To the extent Jose complains that his attorney's belated production to the prosecution of the statement Siona gave in 2009 "created the danger that the trial court would have excluded [Siona] as a witness," that assertion does not establish ineffective assistance for two reasons. First, Jose's attorney explained to the trial court that he did not turn over the statement earlier because he "didn't think [they] were going to find" Siona and therefore "did not expect . . . to call him" as a witness because he was not under subpoena. Jose's attorney also explained that the statement would have given the prosecutor a basis for eliciting testimony from another witness (Cynthia Gutierrez) that would have contradicted Jose's anticipated testimony. Thus, Jose's attorney had a satisfactory tactical reason for not turning over Siona's statement when he believed he was not going to be able to call Siona as a witness.

Second, the belated production of the statement also does not constitute ineffective assistance of counsel because, given that Jose's attorney was ultimately unable to secure

23

Siona's testimony, the risk that the trial court would have excluded that testimony based on a discovery violation never came to fruition. Thus, even if the belated production had been objectively unreasonable, it did not result in any prejudice to Jose. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 [reversal for ineffective assistance of counsel requires showing of "a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted"].)

Finally, to the extent Jose complains that his trial counsel "failed to seek a continuance to obtain [Siona] as a witness," this is an instance where the record does not contain an explanation for the challenged aspect of representation and counsel was never asked for an explanation. Thus, we can reverse only if there simply could be no satisfactory explanation. (*People v. Pope*, *supra*, 23 Cal.3d at p. 425.) This is not such a case. In any event, as we have noted, to prevail on a claim of ineffective assistance of counsel, Jose must show that but for his trial counsel's asserted error, it is reasonably probable he would have received a more favorable result. Jose has not made this showing with respect to the alleged error in failing to seek a continuance. First, he has not shown a reasonable probability that a continuance would have been granted if his attorney had requested one. Second, he has not shown that if the trial court *had* granted a continuance, it is reasonably probable he would have been able to locate Siona and secure his testimony. And third, he has not shown that if Siona had testified, it is reasonably probable the case would have gone better for him. On this last point, Jose completely fails to address with any specificity the differences between Siona's statement and Jose's own trial testimony, or any of the bases on which Siona's testimony could have been impeached, and the effect these factors could have had on the credibility of Siona's testimony.[5]

---

[5] In the trial court, the prosecution offered various reasons why Siona's testimony "would not have altered the outcome of this case," and the trial court noted that Siona's

For all of the foregoing reasons, we conclude that Jose has failed to demonstrate on appeal that he received ineffective assistance of counsel. The question remains, however, whether, despite this failure, he has shown that the trial court erred by not "rais[ing] the issue of ineffective assistance *sua sponte*." We conclude he has not.

It has been said that "it is the duty of the trial judge to protect the defendant's right to a counsel who is *effective*," "[b]ut in discharging that duty the judge must be on his guard neither to infringe upon the defendant's right to counsel of his choice, nor to compromise the independence of the bar." (*Smith v. Superior Court* (1968) 68 Cal.2d 547, 559.) Thus, "when it appears to [a trial judge] that a defense counsel is making serious mistakes to his client's prejudice," "the judge may intervene, at least within reasonable limits, by disallowing pleas or motions to withdraw pleas, controlling the scope of examination, questioning witnesses himself, making appropriate suggestions as to the items or order of proof, commenting on the evidence, admonishing or instructing the jury on his own motion, or exercising any of his other inherent powers over the conduct of the proceedings to insure that the defendant receives a fair trial." (*Id.* at p. 560.)

It has also been said that "it is the duty of a trial judge to see that a case is not defeated by 'mere inadvertence' [citation], or by 'want of attention' [citation], and 'to call attention to omissions in the evidence or defects in the pleadings' which are likely to result in a decision other than on the merits." (*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 457.) Thus, "[f]or a trial court to remain silent in the face of an obviously inept attempt on behalf of a criminal defendant to assert a right created by the Legislature, when a simple statement of the procedural requirement would presumably have cured the defect on the spot and without prejudice to the interests of any party" may,

version of events (from his statement) was "riddled with conflict that would [create] critical problems" for Jose. In asserting his ineffective assistance of counsel claim, Jose does not address these issues.

in appropriate circumstances, constitute "an unwarranted abdication of the judicial role." (*Ibid.*)

Whatever duty the trial court has to intervene to prevent ineffective assistance of counsel, we do not believe the circumstances of this case are such that it was a violation of that duty, or otherwise an abuse of discretion, for the trial court not to "raise the issue of ineffective assistance *sua sponte*" based on the failure of Jose's trial counsel to secure Siona's testimony at trial or seek a continuance during the defense case to "pursue [Siona] as a witness." The circumstances here simply do not suggest such egregious and inexplicable conduct by Jose's attorney that the trial court should have intervened and invited Jose to request substitute counsel for the purpose of assisting him in making a new trial motion based on ineffective assistance of counsel.

IV

*Restitution*

Sergio contends the trial court erred in ordering him to pay direct victim restitution to Guerrero's widow for the value of various items she left at the house after the murder because his "criminal conduct was not a proximate cause of either [her] abrupt deserting of all her household belongings or of the criminal theft and/or destruction of those items by third parties." In the alternative, he contends Guerrero's widow's "failure to mitigate her damages in any degree should bar the court from reimbursing [her] loss through criminal victim restitution." He seeks reversal of the $4,500 award of direct victim restitution against him.

For his part, Jaime contends his trial counsel was ineffective because his counsel did not object to the $11,500 in direct victim restitution sought from him, even though Sergio had already succeeded in having that same amount reduced to $4,500. Jaime requests that we modify the amount of direct victim restitution in his case to $4,500 or order a new restitution hearing. Jaime also argues that if Sergio prevails on his challenge to the $4,500 restitution award against him, we should grant Jaime the same relief we

26

grant Sergio in order to avoid a subsequent habeas proceeding by Jaime based on ineffective assistance of counsel directed at the $4,500.

Jose joins in Jaime's ineffective assistance of counsel argument as to the $7,000 reduction and also purports to join in Sergio's proximate causation and mitigation of damages arguments as to the remaining $4,500.

## A

### *Factual Background*

In May 2011, Sergio pled no contest to the lesser included offense of voluntary manslaughter in exchange for a middle term sentence of six years in prison. Sentencing was scheduled for June, to coincide with the sentencing of Hugo Torres, who had entered into an earlier plea agreement.

Prior to the June sentencing hearing, Guerrero's widow submitted, in support of a claim for restitution, an itemized list of items that were left at the family home after she abandoned it following her husband's murder.[6] According to her statement, "[s]hortly after the shooting, she contacted the bank and told them she would no longer be able to make the mortgage payments [on the house]," and "[t]he bank took the house back." She said "[s]he and her children essentially walked away from their home and their possessions," including Guerrero's "tools and building materials he was using to make improvements to the house." They were (as of the time of her victim statement) sharing a

---

[6] The probation report that was later prepared for Jose in October 2011 contains a victim statement from Guerrero's widow obtained in August 2009 that contains this list. Although Sergio waived a probation report, a probation report was prepared for Hugo for the June 2011 sentencing hearing. That report is not part of the record on these appeals because Hugo did not appeal his conviction. Nevertheless, we see no reason to believe that the victim statement contained in Jose's probation report in October 2011 was any different than the victim statement contained in Hugo's probation report four months earlier. Accordingly, it appears the information regarding restitution that the parties argued over at the June 2011 sentencing hearing was the information from the victim statement in the probation report.

27

rented house with her brother-in-law. The property left at the house, which was valued at $11,500 and for which she was seeking restitution, was as follows: "One clothes washer ($200.00), two clothes dryers ($300.00), two refrigerators ($300.00), two televisions ($500.00), two couches ($200.00), kitchen appliances and utensils ($700.00), a master bedroom set ($1,000.00), children's bunk beds ($300.00), wall hangings/pictures ($500.00), building materials ($7,000.00), a lawn mower ($300.00), ladders ($100.00) and a wheel barrow [*sic*] ($100.00)."

At the June 2011 sentencing hearing, Hugo's attorney objected to the items from the house being included in the victim restitution claim because Guerrero's widow "certainly had the option of having somebody take them and move them to her other residence or put them in storage, what have you." The trial court ordered victim restitution in the amount of $11,500, as requested (not including the amount payable to the victims of violent crime program), "subject to [a] restitution hearing" if Hugo chose to request one.

Sergio's attorney joined Hugo's objections to the amount of victim restitution payable to Guerrero's widow and requested a restitution hearing. The court again ordered $11,500 in victim restitution payable directly to Guerrero's widow. The restitution hearing was set for July, but later apparently was continued to September.

In advance of the restitution hearing, the People filed a brief asserting that "the Victim and her children walked away from their home and their possessions, including furnishings, due to their fear after the children and the Victim witnessed her husband, who only moments prior had been holding their infant daughter, get shot in the head in front of their home . . . . It is due to witnessing this traumatic event . . . that they no longer felt safe remaining there."

Sergio filed an opposition to the request for restitution, arguing that " (1) the government has failed in its burden to specify with particularity the items claimed to be valid objects of restitution and the value of those items, and (2) the government fails to

28

prove how those losses are attributable to the defendant." Sergio asserted that the People had "failed to prove why [Guerrero's widow] was unable to take any or all of these items with her when she moved from the home and in with her brother-in-law or why she was unable to retrieve them later." He further asserted it was "unclear how long [the property] sat at the residence after the incident and more unclear why some items of personal property, such as clothing and other items of personal property were moved to the new residence but not these." Sergio also argued that the claim for $7,000 for building materials was "too vague to respond to and too vague to overcome the claimant's burden of proof."

At the restitution hearing, the court recited the facts of the crime and noted, from the court's recollection of the testimony at trial against the remaining defendants just over a week earlier, that Guerrero's widow had "abandoned the home that night and never returned."[7] When Hugo's attorney argued that she did not "have to leave her home," the court disagreed, based on "having heard the testimony in this case." According to the court, "There was nothing safe about remaining at that house based on upon what happened in this neighborhood." Hugo's attorney then argued that at least "she could have taken those items" for which she was now seeking restitution. He asserted, "They didn't have to abandon the property. They could have taken the property or they could have had other people, friends, professional moving people come in and do it."

Sergio's attorney argued that it was not known what happened to the property left at the house: "We don't know if they [sic] stayed in the house until the bank took it over. We have no idea. [¶] All we know is that this victim who is still local who testified here last week or the week before in this court and was still around and able-bodied and have

---

**7** In fact, at trial Guerrero's widow testified that she "had to leave [the home] that day" and she never *slept* there again. Guerrero's widow testified at trial on August 24, 2011, just over a week before the restitution hearing on September 2.

29

[*sic*] relatives available made, apparently, no effort and we have no explanation why no effort was made to probably take some things of personal property, clothing, et cetera, but simply walk away from the rest and then, thereafter, make no effort to try to retrieve them."

The People argued that the items for which restitution was sought were "large items and anyone [who's] moved knows that this isn't just something that you throw in the back of your car." The People also argued that "it appears based on the neighborhood anyone would be in fear to return to that specific home."

The trial court found that Guerrero's widow "lost all of her personal property because she was afraid to go back or didn't go back" to the house. The court also observed that "it's not unreasonable to think she didn't want to have these items with her any more [*sic*] because of what your clients were involved in." Sergio's attorney interjected, "We keep talking about her not going back; that's not in this record. And I don't know where that comes from. And I don't know if she went back the next day and got some clothes." The court asserted that it was "in the probation report." Sergio's attorney clarified that the probation report did not say she never went back to the house. Sergio's attorney also argued that the court was "ascribing emotional behavior to her," and "we don't know that either." In response, the court referenced the fact that Guerrero's widow was "taking medication for depression and said she would prefer to die but her children need her." Sergio's attorney responded, "I agree that it's a horrible emotional thing for her to go through. I just am not sure that it necessarily gets us that last step that she didn't want to see these things ever again because of the ordeal that happened."

The court concluded that whether Guerrero's widow "didn't want these things or felt she could not retrieve these things," either way it was sufficient to justify a restitution order. The court then found that the stated values for the various items were "within the ballpark," except for the $7,000 for building materials, at least without "further

information as to what it is that was lost and is being claimed." The court suggested putting the matter over for a couple of weeks so the People could provide defense counsel with more information about the building materials. What the court ultimately did, however, was take out the $7,000 and order victim restitution to Guerrero's widow in the amount of $4,500, with leave for the People to file a request for the additional $7,000, along with supporting documents, within 30 days.

Later in September, the People filed a supplemental brief that provided the following additional information: "[D]ue to the size of their family, [Guerrero and his widow] were planning to add two bedrooms to their home as well as a new roof. The $7,000 in building materials . . . was for the cost of those materials, specifically, cement, nails, water heater, wheelbarrows, insulation, sheet rock [*sic*], shingles, roofing material, framing and $4,000 in lumber." It does not appear from the record, however, that any further hearing was ever held on this additional amount with respect to Sergio, or that any additional restitution was ever ordered as to him.

At Jaime's sentencing hearing in mid-October 2011, the court ordered him to pay victim restitution in the amount of $11,500 without objection. Likewise, at Jose's sentencing hearing in early November 2011, the court made the same order as to Jose without objection.

B

*The Award Is Not Supported By Substantial Evidence*

As we have noted, Sergio contends the trial court erred in ordering him to pay direct victim restitution to Guerrero's widow for the value of the items left at the house because his "criminal conduct was not a proximate cause of either [her] abrupt deserting of all her household belongings or of the criminal theft and/or destruction of those items by third parties" and because Guerrero's widow's "failure to mitigate her damages in any degree should bar the court from reimbursing [her] loss through criminal victim restitution." In their brief, the People contended the victim restitution award was proper

31

because defendants "should have foreseen the possibility . . . that the victim's family would move out and never return, thereby losing their possessions." According to the People, "They walked away from their possessions because they were afraid to return and when they did go back, those possessions were stolen. Abandoning the property was realistic as the crime had occurred at the home and the act of abandonment was done in reaction to the criminal act."

There are at least two problems with the People's argument in their brief. First, it is contradictory. On the one hand, the People assert that Guerrero's family left their residence the day of the crime and "never return[ed]." On the other hand, the People assert that "when they did go back, th[eir] possessions were stolen." Second, and more important, there is no evidence in the record to support the argument. Specifically, there is no evidence that Guerrero's widow was "afraid to return" to the residence, no evidence that she and her family "never return[ed]" to the residence, and no evidence that "th[eir] possessions were stolen." Although it certainly would be reasonable for Guerrero's widow to have been afraid following the murder of her husband in the yard, the evidence shows no connection between the reasonable amount of fear one would expect and the failure to retrieve or send someone else to retrieve the contents of the house at some point. Indeed, it appears to be because of the paucity of the evidence here, which the trial court tried to fill in with speculation, that the People ended up arguing factually contradictory scenarios in their brief.

From what appears in the probation report, Guerrero's widow never told the probation officer that she and her children fled the residence immediately after the crime and never returned. What she told the probation officer was that "[s]he and her children *essentially* walked away from their home and their possessions." (Italics added.) However, she said this after only saying that "[s]hortly after the shooting, she contacted the bank and told them she would no longer be able to make the mortgage payments," and "[t]he bank took the house back." Thus, it appears Guerrero's widow abandoned the

32

house to foreclosure by the bank because she could not afford to make the mortgage payments. There was no explanation, however, of why (or when) she abandoned the property in the house for which she sought restitution.

There is also no evidence that Guerrero's widow and her children walked away from their possessions because they were afraid to return. It was the People who first injected the idea of fear in arguing that Guerrero's widow and her children had "to flee that night in fear of what had happened [and] based on this immediacy and emergency they had to leave the furnishings behind." The court later adopted that idea, primarily (it appears) from its view of the evidence in the trial that was going on simultaneously against the three remaining defendants as of the date of the restitution hearing for Sergio (and Hugo, who is not before us).[8] But Guerrero's widow never said she was afraid to return to the property, and she never said she *did not* return to the property. At the trial against the three remaining defendants, this was her pertinent testimony:

"Q.　After he was killed, how much longer did you live there?

"A.　I had to leave that day.

"Q.　Did you ever sleep there again?

"A.　No."

The prosecutor did not elicit any testimony from Guerrero's widow that she never returned to the property, only that she never slept there again. And he did not elicit any testimony about *why* she did the latter. At the restitution hearing, the trial court speculated that she left behind the items for which she was seeking restitution either because "she didn't want these things" because they were associated with the emotional

---

[8]　When Hugo's attorney shook his head in the middle of the trial court's ruling, the trial court responded, "You can disagree with me. Appeal me if you want. I've listened to this case. I know what the circumstances are. I know what this neighborhood is based upon the testimony that I've heard."

trauma of the murder or because she "felt she could not retrieve these things" because of her fear of the neighborhood, but there was no substantial evidence -- either in her statement to the probation officer or in the testimony at the trial against the remaining three defendants -- to support the court's conclusion.[9]

There is also no evidence in the record that the items left behind at the residence were stolen. Indeed, there is no evidence about what happened to them. The statement of Guerrero's widow to the probation officer supports the conclusion that she and her children abandoned the items by leaving them at the house but there was no evidence of what happened to them from there: whether they were stolen by third parties, claimed by the bank after the foreclosure, or even taken by other family members with permission, tacit or explicit. More important, though, is the absence of any *evidence* as to *why* Guerrero's widow abandoned these items. Absent further evidence on the matter, neither we nor the trial court could reasonably conclude that the decision of Guerrero's widow to abandon the property was reasonable and reasonably foreseeable, rather than being (as Sergio argues) an intervening cause that precludes a finding of liability for restitution. (See *People v. Jones* (2010) 187 Cal.App.4th 418, 427.)

In fact, at oral argument the People essentially abandoned the arguments in their brief defending the restitution award and conceded that the matter must be remanded because the existing evidence is insufficient to support the award. Thus, we reverse the restitution award against Sergio for lack of substantial evidence and remand for a new restitution hearing. (See *People v. Thygesen* (1999) 69 Cal.App.4th 988, 995-996.)

---

**9**        Although Sergio does not complain about it directly, we find it problematic that in ordering restitution against him, the court relied on its recollection of testimony given a week or so earlier at the trial against the remaining defendants: a trial at which neither Hugo nor his attorney was present. When the court represented at the outset of the restitution hearing that "the testimony before this Court" was that Guerrero's widow "abandoned the home that night and never returned," the court was mistaken, but neither of the defendants who were then contesting the restitution award could have known that.

As both Jaime and Jose generally appear to recognize, because they did not object to the restitution orders against them, they have forfeited any direct challenge on appeal to those orders and must instead bring any challenge to those orders under the rubric of ineffective assistance of counsel.[10]  Jaime makes an argument on that basis, in which Jose joins, but that argument is targeted only to the $7,000 reduction Sergio's attorney obtained that their attorneys failed to request also.  Nevertheless, because we are reversing the restitution award as to Sergio and remanding for a new restitution hearing, and because the basis of the restitution award against each defendant is the same, we conclude that the appropriate resolution here is to reverse the direct victim restitution orders as to all three defendants, and to remand for new restitution hearings for all three of them.

## DISPOSITION

As to Sergio, the order of $4,500 in victim restitution payable to Guerrero's widow is reversed, and the case is remanded for a new restitution hearing.  Otherwise, the judgment against Sergio is affirmed.

As to Jaime and Jose, their convictions of first degree murder are reversed unless the People accept reduction of the convictions to second degree murder.  If, after the filing of the remittiturs in the trial court, the People do not bring Jaime and Jose to retrial on the premeditation and deliberation element of first degree murder within the time set forth in Penal Code section 1382, subdivision (a)(2) -- 60 days unless waived by the defendant -- then the remittiturs shall be deemed to:  (1) modify the judgments to reduce

---

**10**    To the extent Jose purports to adopt Sergio's argument of error, Jose cannot do so because he forfeited any direct assertion of error by failing to object in the trial court.

their convictions to second degree murder; and (2) reverse the orders of $11,500 in victim restitution payable to Guerrero's widow, and the trial court shall resentence both defendants accordingly and shall conduct new restitution hearings.


                                                                         ROBIE , J.


We concur:


NICHOLSON , Acting P. J.


DUARTE , J.